B. Lance Entrekin (#016172)
**The Entrekin Law Firm**
3101 North Central Avenue
Suite 740
Phoenix, Arizona 85012
(602) 954-1123
E-mail: lance@entrekinlaw.com
Attorney for Plaintiff

### IN THE FEDERAL DISTRICT COURT OF ARIZONA

| | |
|---|---|
| Christopher Walsh,<br><br>  Plaintiff,<br>v.<br><br>LG Chem America, a Delaware corporation; Oueis Gas, a New Mexico corporation; LG Chem, Ltd., a South Korean corporation,<br><br>  Defendants. | NO. 2:18-CV-01545-SPL<br><br>**PLAINTIFF'S RESPONSE TO DEFENDANT OUEIS GAS INC.'S MOTION TO EXCLUDE THE TESTIMONY AND OPINIONS OF CHESTER SANDBERG PURSUANT TO FEDERAL RULE OF EVIDENCE 702** |

Plaintiff respectfully responds to Defendant's Motion to Exclude the Testimony and Opinions of Chester Sandberg Pursuant to Federal Rule of Evidence 702 and requests that the Court deny the Motion in its entirety. This response is supported by the following.

**I.    FACTS**

   **A.    Batteries at Issue**

On August 5, 2015, Plaintiff Chris Walsh ("Chris") purchased two Sony batteries from Defendant Oueis Gas ("OG") for use in vaping. (**Exhibit 1**, Walsh deposition at p. 58). On October 28, 2015, he purchased two LG HG2 18650 lithium ion batteries from OG, also for use in vaping. (**Exhibit 2**, Oueis Gas 1). Extensive disclosures establish that these were the only two sets of vaping batteries he owned as of November 18, 2016. (**Exhibit 3**, disclosed purchase records for Walmart, Newegg, paypal, amazon, ebay, 2014-2016).

   **B.    The Incident**

On November 18, 2016, surveillance video shows Chris eating pizza with his family and friends at Boss Pizza. (**Exhibit 4**, surveillance video, filed under separate cover). He testified that he had the two LG HG2 18650 batteries from OG, his cell phone and his keys in his right front pocket. (**Exhibit 1** at p. 98). At 10:45:57 of the surveillance video,[1] Chris cringes and pulls his cell phone out of his right front pocket. This left only the LG HG2 18650 batteries and his keys in his pocket. One second later, his right front pocket explodes and he catches fire. (**Exhibit 4**). The actual time of the explosion was 7:03 p.m. (**Exhibit 5**, EMT record).

His friends and relatives put out the fire and immediately called the EMT's. (**Exhibit 4; Exhibit 5**). Chris was rushed to the Arizona Burn Center and the staff there began administering treatment at 7:40 p.m. (**Exhibit 6**, medical records). They immediately put Chris on Versed intravenously, administered a large dose of Fentanyl and began to remove his pants, in order to commence painful debridement on his legs. The staff asked Chris' now ex-girlfriend, Lindsey Niziolek, to help remove his pants. (**Exhibit 7**, Lindsey Niziolek deposition at pp. 32-33).

Lindsey testified that as she was removing Chris' pants, "the shell of the batter(ies)" were "falling out on the floor." There were only shells because "(t)he insides were gone." She further emphasized "the middle was gone." In the explosion, the working electronic interiors of both batteries were totally incinerated and disappeared, leaving only the charred outer "shells" or packaging. Lindsey testified she picked the charred shells up, placed them "in a garbage bag that they gave me" and the hospital staff threw them away. (**Id.**)  This occurred at 7:40 p.m. (**Exhibit 6**).

While Lindsey was picking up the charred shells, Chris was on heavy anesthetic, in and out of consciousness and they were cutting burned flesh from his legs with a scalpel, less than 45 minutes after the fire. Chris' family retained his keychain and

---

[1] The surveillance video shows 10:45:57 on 11/19/16, it was actually 7:03 p.m. on 11/18/16, this is not disputed and does not affect any disputed issue herein.

returned it to him. This has been retained to the present and disclosed for inspection. (**Exhibit 8**, emails). Neither side's expert has ever seen the actual keys that were on the keychain at the time. (**Exhibit 1** at pp. 70-71).

### C.    Data Gathering by Chester Sandberg

Chris hired Chester Sandberg ("Chet") as an expert witness on liability and causation. Chet has a BS in mechanical engineering from MIT and a MS in electrical engineering from Stanford. (**Exhibit 9**, Sandberg CV). Chet designed lithium ion batteries for Altairnano for five years (**Exhibit 10**, Sandberg deposition at pp. 108-09) and has published over 70 technical papers (many of them on lithium ion batteries) (**Exhibit 9**). For many years, Chet also designed consumer warnings for electrical heaters, electrical heating elements and heat tracing on pipes, among other products, for the Raychem Corporation. (**Exhibit 10** at p. 120). He is also a life member of the National Fire Protection Association. (**Id.** at p. 27).

Chet: 1) reviewed the surveillance video of the incident; 2) interviewed Chris; 3) examined the battery charger; 4) examined the keychain which had been in Chris' pocket; 5) examined an exemplar pair of pants identical to those Chris was wearing at the time of the accident; 6) examined all purchase receipts and all warnings from Oueis Gas ("OG"), Bates stamped "Oueis Gas 1-71"; 6) examined all purchase receipts for Chris from other vaping sources for 2014-16; 7) examined all LG HG2 18650 battery patents and did an extensive literature search on their safety history and why they explode; 8) read the medical records; and 9) later read the depositions of Chris and witnesses Gail and Lindsey Niziolek. (**Exhibit 11**, Sandberg report and Sandberg file, produced to Defendant). There was no other physical evidence available for gathering.

### D.    Reliable Principles and Methods, Reliably Applied - NFPA 921

For more than a decade, it has been very well understood that if a piece of metal touches both the positive and the negative tabs of any 18650 lithium ion battery, this can

cause an "external short," which can cause a thermal runaway and explosion.[2]

National Fire Protection Association Standard 921 ("NFPA 921") sets standards for fire investigation. NFPA 921 states that as a first step, a fire investigator should "first determine and establish the" area of origin. (NFPA 921, 4.1). By reviewing the surveillance video, interviewing Chris and looking at the sales receipts, Chet determined that the area of origin was Chris' right front pocket and it was more likely than less likely that at the time of the explosion, the pocket contained keys and two LG HG2 18650 batteries. (**Exhibit 11**).

The next step is to "define the problem." (NFPA 921, 4.3.2). Chet's investigation led him to define the problem as an explosion in Chris' right front pocket at 7:03 p.m. in Boss Pizza on 11/18/16, setting Chris on fire.

The next step is collecting "(f)acts about the fire incident..." (NFPA 921, 4.3.3). Chet collected all the facts available, as set forth above.

The next steps are to analyze the data "by inductive reasoning" and "develop a hypothesis." (NFPA 921, 4.3.4 and 4.3.5). Chet analyzed the data and hypothesized that an LG HG2 18650 battery experienced an external short and exploded, because the metal keys or keychain in Chris' pocket touched the battery's positive and negative tabs. (**Exhibit 11**).

Chet found no evidence to render an alternative cause more likely than less likely. It is known that substantial damage to the battery or overcharging of the battery

---

[2]See, for instance, "Safety Limitations Associated With Commercial 18650 Lithium Ion Cells," J. Jeevarajan, NASA White Paper, 2010; "Simulation and Experimental Study on Lithium Ion Battery Short Circuit," R. Zhao, J. Lu, Applied Energy, 2016; "External Short Circuit Fault Diagnosis for Lithium Ion Batteries," B. Xia, Z. Chen, IEEE Transportation, 2010; "Short Circuit Scenarios in a Power Optimized Lithium Ion Battery Cell," T.G. Zavalis, M. Behm, ECS Meeting Abstracts, 2011.

can cause explosions, but interviews with Chris, examination of the charger and the later deposition of Lindsey Niziolek produced no evidence of either event. In theory, a manufacturing defect could cause an explosion, but Chet's extensive review of the literature turned up nothing. Finally, external temperatures of 1000 Farenheit or thereabouts can cause a lithium ion battery to explode,[3] but Lindsey Niziolek's deposition establishes the batteries were loose in Chris' pants and the video shows his father wearing a sweater in November at the time of explosion, so this did not happen. Chet testified that none of these specific hypotheses were more likely than less likely, based on the data gathered. (**Exhibit 10** at pp. 114-15).

NFPA 921 then requires that Chet "test the hypothesis," but this test does not have to be experimental, it may be merely "cognitive." (NFPA 921, 4.3.6). Chet did both cognitive and experimental. He first did some testing and calculations and found that if either a keychain or a key touched the positive and negative tabs of an 18650 lithium ion battery, this would create far more amps than was required to cause a thermal runaway and explosion. (**Id.** at pp. 116-17).

He then obtained an exemplar key and an exemplar LG HG2 18650 battery and touched the key to both the positive and negative tabs for a few moments. (**Exhibit 12,** test video). The battery caused an explosion, like the one depicted in the surveillance video. (**Id.; Exhibit 4**).

E.   **Design Defect**

Chet opined that the subject battery was defective under the "cost/benefit" test (*RAJI (6th) Product Liability 3*) because: 1) there were three alternative designs, which he described; 2) all were technologically and economically feasible in 2015; 3) all would have prevented this accident; and 4) the costs of an accident like this

---

[3] https://www.consumerreports.org/safety-recalls/why-lithium-ion-batteries-still-explode-and-whats-being-done-to-fix-the-problem/

1  overwhelmingly outweigh any benefits of the design utilized. (**Exhibit 10** at pp. 112-
2  13).
3        Under the "consumer expectation" test (*RAJI (6th) Product Liability 3*), Chet
4  opined, based on his experience with designing and testing warnings on consumers, that
5  they would not expect an external short leading to explosion when placing a battery in
6  their pocket. (**Exhibit 11** at p. 4).

      **F.**    **Warnings**

8        Chris was asked at deposition what kind of warning would have changed his
9  behavior and he responded that if he had been made aware of "**an injury**," then "**I
10  probably would have changed a lot of what I've done or what I had done up to that
11  point.**" He then testified if he had been made aware that someone "**had been hurt, I
12  would have been the first in line to go in and find ways to change the way that I
13  was doing that. But, you know, to -- I thought that I was, you know -- I thought
14  everything was fine because everything was working the way it was supposed to
15  work**." (**Exhibit 1** at pp. 90-91).
16        Chet's analysis determined that no warnings addressing the dangers of explosion,
17  fire or serious injury were given prior to sale. (**Exhibit 10** at pp. 119-22). After sale,
18  warnings were put up in the shop and on the later sales receipts. The "warnings" were
19  26 lines long, in pica sized type and addressed the relevant dangers, along with many
20  other issues. (**Exhibit 11** at Appendix A). Based on five years of designing lithium ion
21  batteries and several years designing warnings for fire danger on electrical consumer
22  products, Chet opined these "warnings" were insufficiently commensurate with the
23  danger of explosion and potential death and therefore, inadequate. (**Id.**)

**II.**    **LAW**

      **A.**    **Standard of Review**

26        Chet's testimony: 1) must be based on sufficient facts or data; 2) must be the
27  product of reliable principles and methods; and 3) said principles and methods must be
28  reliably applied to the facts of the case. *Vigilant Ins. v. Sunbeam*, No. CIV-02-0452-

PHX-MHM (D. Ariz. 2005); *Daubert v. Merrell Dow*, 509 U.S. 579, 589-97 (U.S. 1993).

### B. Causation - "Sufficient Facts or Data"

With regard to "sufficient facts or data" gathered by an expert after a fire, in *Rocky Mountain Fire & Cas. Co. v. Biddulph Oldsmobile*, 131 Ariz. 289, 640 P.2d 851 (Ariz. 1982), plaintiff sued a motor home dealer on a theory of strict liability after a new motor home caught fire and "burned to the frame." *Id.* at 291. Noting that "*the plaintiff [was] limited to circumstantial evidence because the motor home [was] not available for inspection*," the Arizona Supreme Court allowed the claim to go to the jury on a purely circumstantial theory of defect. *Id.* at 292.

The Supreme Court was more explicit in *Dietz v. Waller*, 141 Ariz. 107, 685 P.2d 744 (Ariz. 1984), holding plaintiffs "*must be permitted to rely upon circumstantial evidence alone in strict liability cases*, because it is unrealistic to expect them to otherwise be able to prove that a particular product was sold in a defective condition...*This would be especially true in cases such as this one where the product has disintegrated or burned up.*" *Id.* at p. 110 (emphasis added).

The Court further held that plaintiffs must only produce circumstantial evidence to permit "*an inference that the accident was caused by a defect*." *Id.* at p. 111. They are not required to "*eliminate with certainty all other possible causes of an accident*," but must only "*present evidence sufficient to allow the trier of fact to reasonably infer that it was more probable than not that the product was defective.*" *Id.* (emphasis added)

As it is required to do on this substantive legal issue, this Court has repeatedly followed *Dietz, supra*, when faced with the argument that a plaintiff's expert cannot satisfy *Daubert*, because the fire destroyed physical evidence and therefore the plaintiff's expert is impermissibly speculating. In *Phil. Indem. v. BMW*, No. CV-13-01228-PHX-JZB (D. Ariz. 2015), the defendant made the exact same argument the Defendant in this case is making. This Court cited *Dietz* and held: "*although the vehicle was available for inspection, there is no dispute that the at-issue insulation was*

*destroyed in the fire. Accordingly, Plaintiffs may rely on circumstantial evidence to establish their claim.*"

### C. Causation - Reliable Principles and Methods, Reliably Applied

With regard to the second and third requirements, while it is by no means definitive or exclusive, NFPA 921 has repeatedly been found by this Court to satisfy the "reliable principles and methods" and "reliably applied to the facts" requirements of *Daubert* in cases where the cause of a fire is in any way disputed. See, *Phil. Indem. v. BMW*, No. CV-13-01228-PHX-JZB (D. Ariz. 2015) ("Mr. Nelson's and Mr. Hogge's testimony is reliable to the extent they complied with NFPA 921 in forming their opinions"); *Allstate Insurance Company v. Ford Motor Company*, No. CV-08-2276-PHX-NVW (D. Ariz. 2010) ("Mr. Hogge's testimony is reliable if he complied with either NFPA 921 or the general scientific method.")

### D. Design Defect

Under Arizona law, a "product is defective and unreasonably dangerous because of a design defect if the harmful characteristics or consequences of its design outweigh the benefits of the design." *RAJI (6th) Product Liability 3*. This test is called the "cost/benefit" test.

"A product is [also] defective and unreasonably dangerous because of a design defect if it fails to perform as safely as an ordinary consumer would expect when the product is used in a reasonably foreseeable manner." *Id.* This test is called the "consumer expectation" test.

### E. Warnings

Under Arizona law, there is a rebuttable presumption in strict liability warning cases that an adequate warning would have been heeded. *Golonka v. General Motors*, 65 P.3d 956, 969 (App. 2003).

Regarding qualifications to render opinions on the adequacy of warnings in a product liability case under *Daubert* and Rule 702, FRCP, in *Triant v. AMS*, CV-12-00450-PHX-DGC (D. Ariz. 2020), plaintiffs offered a physician who had

performed a large number of pelvic floor surgeries as an expert on hernia mesh warnings. He had no experience designing hernia mesh or formulating and/or testing warnings. This Court held that as a surgeon who used the product, understood the risks, read the warnings and counseled with patients, he was fully qualified to opine on whether hernia mesh warnings satisfied the Arizona strict liability standard. This is because his specialized knowledge would help the jury to better understand the evidence. *Id.*; Rule 702, FRCP.

**III.   DISCUSSION**

    **A.   Chet's Design Defect Theories are Admissible**

Defendant's first argument is that Chet did no cost benefit analysis, he is not a human factors expert, no expert may opine on defect and therefore, his design opinions are inadmissible. (Motion at p. 7).

Chet did extensive cost/benefit analysis. He testified: 1) there were three alternative designs, which he described; 2) all were technologically and economically feasible in 2015; 3) all would have prevented this accident; and 4) the costs of an accident like this outweigh any benefits of the design utilized. (**Exhibit 10** at pp. 112-13).

The arguments that Chet must be a human factors expert to offer design opinions and that an expert cannot opine a product is defective are offered without authority and require no rebuttal.

    **B.   Chet's Causation Opinions are Admissible**

Defendant makes an extremely garbled, multi pronged argument that Chet cannot testify on causation because: 1) he did not examine the keychain or the keys; 2) he has gathered no data and done no analysis; 3) he has not identified identical incidents; 4) he does not know what an ordinary consumer would expect. (Motion at pp. 8-10).

Both Chet and Defendant's expert have examined the keychain. (**Exhibit 8**, emails). Neither have seen the actual keys on the keychain at the time of the explosion. (**Exhibit 1** at pp. 70-71). As fully set forth in Plaintiff's Response to the Motion to

Dismiss, Defendant's expert thoroughly described a year ago what a proper forensic examination in this case would require and was clear that examining the original keys was wholly unnecessary and irrelevant. This argument is a very recent invention first made on June 21, 2021 and is now shoe horned into every defense motion.

As described in great detail above, Chet gathered extensive evidence and subjected it to extensive analysis under NFPA 921. This is far more than any expert did in *Rocky Mountain, supra, Dietz, supra* or *Philadelphia Indem., supra*, and all of those cases and experts were allowed to go forward.

Chet testified regarding over 100 substantially similar incidents (**Exhibit 10** at pp. 108-09), but he was not required to testify about any in order to render his testimony admissible.

Finally, after many years designing lithium ion batteries and designing electrical fire warnings for consumers, he has more than adequate experience to opine a consumer would not expect that placing a battery in their pocket would cause a fiery explosion.

### C. Chet's Exemplar Test is Admissible

At pp. 11-12, Defendant argues that Chet's analysis only creates a slight possibility, not a probability, that the accident occurred in the manner he opines on.

Chet established the area of origin (NFPA 921, 4.1), defined the problem (NFPA 921, 4.3.2), collected the available data (NFPA 921, 4.3.3; *Dietz, supra*), analyzed it by inductive reasoning (NFPA 921, 4.3.4) and developed a hypothesis: that an LG HG2 18650 battery experienced an external short and exploded, because the metal keys or keychain in Chris' pocket touched the battery's positive and negative tabs. (NFPA 921, 4.3.5). This is a well recognized phenomenon in the literature and Chet has identified over 100 substantially similar incidents.

Chet tested the theory mathematically and determined that contact between the keys or keychain and the tabs on the end of the battery could easily cause an explosion like the one on video. (NFPA 921, 4.3.6). He then physically tested the theory on video and the result strongly matched the accident. (NFPA 921, 4.3.6). Chet concluded and

testified it was more than 50% likely this was the cause of the accident.

Interviews with Chris, examination of the charger and the later deposition of Lindsey Niziolek produced no evidence of overcharging or substantial prior battery damage. Chet's review of the literature turned up no known manufacturing defect and the restaurant was too cool for thermal abuse. Chet therefore categorized these theories as less than 50% probable. His opinion is wholly admissible.

### D. Chet's Warning Opinions are Admissible

Defendant argues Chet's warning opinions are inadmissible because Chris Walsh did not follow warnings. (Motion at pp. 13 and 15).

Chris testified that if he had been made aware of "**an injury**," then "**I probably would have changed a lot of what I've done or what I had done up to that point.**" He then testified if he had been made aware that someone "**had been hurt, I would have been the first in line to go in and find ways to change the way that I was doing that. But, you know, to -- I thought that I was, you know -- I thought everything was fine because everything was working the way it was supposed to work**." (**Exhibit 1** at pp. 90-91).

There is a rebuttable presumption in strict liability warning claims that an adequate warning would have been heeded. *Golonka v. General Motors*, 65 P.3d 956, 969 (App. 2003). In light of Chris' testimony, that presumption is not rebutted and is operative. *Id.*

### E. Feuerstein is Wholly Inapplicable

Defendant cites *Feuerstein v. Home Depot*, No. 2:12-cv-01062 JWS (D. Ariz. 2014) for the proposition that Chet is not qualified to offer opinions on warnings for lithium ion batteries. (Motion at pp. 13-14).

In *Feuerstein*, plaintiffs offered "expert" Weller on ladder warnings. Weller had never designed ladders or ladder warnings, his background was as an uneducated house painter who used ladders. When asked to prove that he had experience with ladder warnings, since he clearly had no training and education, Weller claimed by affidavit to

have written a ladder safety manual for WalMart and to have advised on a ladder warning standard for ANSI.  The Court found both claims to be provably false.

Chet is an MIT/Stanford educated electrical engineer who designed lithium ion batteries for years, published papers and received patents for same and also spent years designing consumer warning labels addressing the fire risks of electrical consumer products.  It is absurd to suggest that *Feuerstein, supra*, has any relevance whatsoever or that Chet is not qualified.

### F. Chet's Methodology Was Fully Admissible

Finally, Defendant argues that the "methodology" behind Chet's warning opinions renders them inadmissible, because he has not relied on human factors analysis or warning efficacy data sets. (Motion at p. 14).

No authority anywhere has ever required this, which is presumably why Defendant cites nothing on point.  In *Triant v. AMS*, CV-12-00450-PHX-DGC (D. Ariz. 2020), plaintiffs offered a physician who had performed a large number of pelvic floor surgeries as an expert on hernia mesh warnings.  He had no experience designing hernia mesh or designing hernia mesh warnings.  This Court held that as a surgeon who used the product, understood the risks, read the warnings and counseled with patients, he was fully qualified to opine on whether warnings satisfied the Arizona standard.  This is because his specialized knowledge would help the jury to better understand the evidence. *Id.*; Rule 702, FRCP.

Chet has years of experience designing lithium ion batteries, designing electrical fire warnings and working with lithium ion battery consumers.  He is more than qualified to opine that placing 26 lines of pica type on a sales receipt, months after the sale of the product at issue, which touches on fires along with several other topics, is not an adequate warning, when the product has the potential to burn someone to death.  His specialized knowledge will help the jury to better understand the evidence. *Id.*; Rule 702, FRCP.

### IV. CONCLUSION

For the reasons given, Plaintiff respectfully requests that the Court deny the Motion in full.

DATED this 1st day of July, 2021.

THE ENTREKIN LAW FIRM

By: s/Lance Entrekin
B. Lance Entrekin, Esq.
The Entrekin Law Firm
3101 North Central Avenue
Suite 740
Phoenix, Arizona 85012

SERVICE BY ELECTRONIC MAIL MADE ON THE DATE ABOVE GIVEN ON:

Tori Levine, Esq.
Lori A. Zirkle, Esq.
Bowman & Brooke LLP
Suite 1600, Phoenix Plaza
2901 North Central Avenue
Phoenix, Arizona 85012-2761
Attorneys for Oueis Gas