**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Christopher Walsh,<br><br>           Plaintiff,<br><br>vs.<br><br>LG Chem America, et al.,<br><br>           Defendants. | No. CV-18-01545-PHX-SPL<br><br>**ORDER** |

Before the Court is Defendant's Motion to Exclude the Testimony and Opinions of Chester Sandberg Pursuant to Federal Rule of Evidence 702. (Doc. 104). The Motion has been fully briefed and is ready for review.[1] (Docs. 104, 113, 124). Defendant seeks to exclude Sandberg's opinions on causation, design defect, and warnings defect. (Doc. 104 at 7, 13). The Motion will be granted, as set forth below.

**I.     BACKGROUND**

This is a products liability case involving two batteries from a vaping device. (Doc. 30 at 2). Plaintiff purchased the vaping device and batteries from Defendant retail smoke shop Oueis Gas, Inc. on October 28, 2015. (*Id.*). On November 18, 2016, Plaintiff alleges those same batteries reacted with a set of keys in his right pocket and exploded, causing serious burns. (*Id.*). Plaintiff filed a complaint against Defendant on May 22, 2018, with

---

[1] Because it would not assist in resolution of the instant issues, the Court finds the pending motion is suitable for decision without oral argument. *See* LRCiv. 7.2(f); Fed. R. Civ. P. 78(b); *Partridge v. Reich*, 141 F.3d 920, 926 (9th Cir. 1998).

four counts: (1) negligent design; (2) negligent failure to warn; (3) strict liability/design defect; and (4) strict liability/information defect. (*Id.* at 3–4).

Following the incident, Plaintiff negligently failed to preserve the batteries and keys as evidence. (Doc. 131 at 5). As a result, Defendant moved for an adverse instruction based on Plaintiff's spoliation of evidence, which this Court granted. (*Id.* at 6).

In preparing its case, Plaintiff consulted Chester Sandberg as an expert witness on liability and causation. (Doc. 113 at 3). Sandberg has "a BS degree from Massachusetts Institute of Technology in Mechanical Engineering, and an MS in Electrical Engineering from Stanford University." (Doc. 113-9 at 2). Relevant to this case, Sandberg has experience with lithium-ion battery use and failure analysis, worked for a lithium-ion battery manufacturer, and has been associated with lithium-ion electrical storage projects. (*Id.*). On February 27, 2020, Sandberg issued his Report and drew several conclusions as to causation, design defects, and warning defects. (Docs. 104-2 & 113-11). On March 26, 2021, Sandberg was deposed by both parties. (Docs. 104-1 & 113-10).

## II.  LEGAL STANDARD

Federal Rule of Evidence ("FRE") 702 permits parties to file motions to exclude to ensure relevance and reliability of expert testimony. *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152–53 (1999). FRE 702 provides that:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. The Rule imposes on the trial courts a gatekeeping obligation to "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993). "Whether the expert is

2

appropriately qualified, whether her testimony is relevant, and whether her testimony is reliable are all distinct inquiries under Rule 702." *Contreras v. Brown*, No. CV-17-08217-PHX-JAT, 2019 WL 2080143, at *1 (D. Ariz. May 10, 2019).

The proponent of the expert evidence—here, Plaintiff—has the burden of proving the expert's testimony is admissible under Rule 702 and the *Daubert* standard. *Grant v. Bristol-Myers Squibb*, 97 F. Supp. 2d 986, 989 (D. Ariz. 2000). "When an expert meets the threshold established by Rule 702 as explained in *Daubert*, the expert may testify and the jury decides how much weight to give that testimony." *Id.* When the expert does not meet the threshold, the Court may prevent her from providing testimony. *See Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.*, 738 F.3d 960, 969 (9th Cir. 2013) ("Basically, the judge is supposed to screen the jury from unreliable nonsense opinions, but not exclude opinions merely because they are impeachable.").

### III.   DISCUSSION

In the Motion, Defendant seeks to exclude Sandberg's opinions on causation, design defect, and warnings. Defendant argues these opinions are not reliable because they are not based on sufficient facts and evidence or a reliable methodology. (Doc. 104 at 1).

**A. Sandberg's Causation Opinions**

Sandberg concludes that the cause of the explosion was a thermal runaway event caused by an external short circuit of the battery. (Doc. 104-1 at 36). Specifically, the "[u]nprotected terminals of the 18650 battery were shorted" when Plaintiff placed the battery in his pocket, and it contacted his keys. (Doc. 104-2 at 2). Defendant argues that Sandberg's causation opinion should be excluded under FRE 702 because it lacks sufficient facts or data to support it and because Sandberg failed to employ a reliable methodology in reaching the conclusion. (Doc. 104 at 7). Plaintiff argues that Sandberg's causation opinion is sufficiently supported by the evidence that was available to him, and that Sandberg reliably applied the protocol set out in the National Fire Protection Association ("NFPA") publication *NFPA 921: Guide for Fire and Explosion Investigations* ("NFPA 921") to reach his conclusion. (Doc. 113 at 3–5, 10).

The parties here agree that NFPA 921 is a recognized and reliable method of determining the origin and cause of the explosion. (Docs. 104 at 6 & 113 at 4). Federal courts, including this Court, have also recognized NFPA 921 as a reliable method under *Daubert*. *See, e.g.*, *Fireman's Fund Ins. Co. v. Canon U.S.A., Inc.*, 394 F.3d 1054, 1057–58 (8th Cir. 2005); *Philadelphia Indem. Ins. Co. v. BMW of N. Am. LLC*, No. CV-13-01228-PHX-JZB, 2015 WL 5693525, at *6 (D. Ariz. Sept. 29, 2015). When investigating a fire or explosion, the first step under NFPA 921 is to "determine and establish the origin." NFPA 921 § 4.1. Next, NFPA 921 explains that the scientific method is applied using the following steps: (1) define the problem; (2) collect data; (3) analyze the data; (4) develop a hypothesis based on the data; (5) test the hypothesis. NFPA 921 § 4.3.

In the Response, Plaintiff walks through the NFPA 921 analysis that he asserts Sandberg conducted. (Doc. 113 at 4–5). According to Plaintiff, Sandberg first established the area of origin and defined the problem. (*Id.* at 4). Next, Sandberg collected the available evidence: surveillance video of the incident; examinations of the keychain, an exemplar pair of pants, and all purchase receipts and warnings from Defendant; an interview with Plaintiff; the deposition transcripts of Plaintiff, Lindsay Niziolek (Plaintiff's ex-girlfriend), and Gail Niziolek (Lindsay's mother); an examination of LG HG2 18650 battery patents; and an "extensive" literature search on the batteries' safety history and why they explode. (*Id.* at 3). From this evidence, Plaintiff asserts that Sandberg ruled out all but one potential cause and developed his hypothesis: that the battery experienced an external short and exploded, "because the metal keys or keychain in [Plaintiff]'s pocket touched the battery's positive and negative tabs." (*Id.* at 4). Finally, Sandberg tested this hypothesis by conducting a demonstration in which he touched a key to both ends of an exemplar battery and caused an explosion similar to the one in the surveillance video. (*Id.* at 5).

This Court takes issue with Plaintiff's NFPA 921 argument because nowhere in Sandberg's Report is NFPA 921 even mentioned. Even at Sandberg's deposition—at least in the excerpts provided to the Court—the only mention of the NFPA is when Sandberg states that he is a life member of the "NEC," which he explains is a part of the NFPA. (Doc.

113-10 at 3); *see Werth v. Hill-Rom, Inc.*, 856 F. Supp. 2d 1051, 1059 (D. Minn. 2012) ("The most fundamental problem with Plaintiffs' argument is that nowhere in the nearly 300-page Report . . . is NFPA 921 ever mentioned. . . . Plaintiffs simply assert in their brief that their experts followed this well-recognized methodology without proffering any evidence to support it."). In comparison, the experts in *Philadelphia Indemnity Insurance Company*—a case to which Plaintiff analogizes[2]—explicitly mention NFPA 921 in their conclusions and reports. *Philadelphia Indem. Ins. Co.*, 2015 WL 5693525, at *3, *4 ("Mr. Nelson concluded [that]: 'Based on the evaluation of the available data . . . and utilizing the recognized investigation methods, including the Scientific Method as defined in *NFPA 921*, the area of fire origin was determined to be . . . .'"; "Mr. Hogge states in his Report that he followed the Scientific Method in NFPA 921 . . . ."). Sandberg's failure to mention NFPA 921 or to explain its role in his analysis undermines Plaintiff's assertion that Sandberg conducted an "extensive analysis" under NFPA 921. (Doc. 113 at 10).

However, whether Sandberg actually relied on NFPA 921 in reaching his causation conclusion is not dispositive on the issue of admissibility under FRE 702. "[A]n expert's reliance on a methodology other than NFPA 921 does not render his opinions per se unreliable." *Affiliated FM Ins. Co. v. LTK Consulting Servs., Inc.*, No. C06-1750JLR, 2014 WL 1494023, at *4 (W.D. Wash. Apr. 16, 2014); *Russell v. Whirlpool Corp.*, 702 F.3d 450, 455 (8th Cir. 2012) ("We have held NFPA 921 qualifies as a reliable method endorsed by a professional organization, . . . but we have not held NFPA 921 is the *only* reliable way to investigate a fire."). The question then is whether Sandberg's conclusion—that an external short circuit caused the explosion—is sufficiently grounded in the "methods and procedures of science" rather than in "subjective belief or unsupported speculation." *Daubert*, 509 U.S. at 589–90.

---

[2] The other two cases to which Plaintiff cites—*Dietz v. Waller*, 141 Ariz. 107 (1984) and *Rocky Mountain Fire & Casualty Co. v. Biddulph Oldsmobile*, 131 Ariz. 289 (1982)—are inapposite to the present case. They stand for the proposition that Plaintiff be allowed to rely on circumstantial evidence alone in a strict liability case; neither case dealt with the reliability or admissibility of expert opinion under FRE 702.

This Court first notes that Sandberg's Report fails to explain his causation opinion in any meaningful way. Instead, it merely states Sandberg's causation conclusion as a factual statement in the opening paragraph: "Unprotected terminals of the 18650 battery were shorted when [Plaintiff] placed the cell in his pocket with his keys." (Doc. 104-2 at 2). The Report does not support this conclusion in any way and fails to explain how it was reached. The Report makes no mention of other possible causes, even though there are several other recognized causes of thermal runaway aside from just external shorts. Specifically, the parties and their experts agree that potential causes include internal shorts, external shorts, damage to the battery, overcharging, manufacture defects, and overheating. (Docs. 104-1 at 7–9 & 113-10 at 7–8). Sandberg's Report, however, appears to operate under the assumption that an external short caused the explosion, and instead focuses on Sandberg's defect analysis.

A review of Sandberg's deposition testimony—at least those excerpts provided to this Court by the parties—also fails to shed light on the basis for Sandberg's causation opinion. Sandberg's deposition statements on causation are largely just restatements of his conclusion. (*See, e.g.*, Doc. 104-1 at 8 ("[T]he only one that was really probable in this case was that it was shorted out in his pocket, and I tested that and showed that, yep, that was the one that probably happened."); Doc. 104-1 at 36 ("I'm saying that the predominance of evidence in my mind shows that the keys shorted out the battery, and it's more than 51 percent likely that that happened. So you can do a whole bunch of hypotheticals of other things that could happen, but, in this case, it didn't happen. The keys clearly shorted it out."); Doc. 113-10 at 16 ("Well, going through the five [possible causes] that [Defendant's expert] said, the only one it could be is a short out of the terminals, negative and positive. That's the only one it could be.")). Sandberg did reveal, at least in part, how he ruled out an "internal short" as a potential cause, stating that an internal short was unlikely because it would have more likely occurred while the battery was on the charger, and not while in Plaintiff's pocket. (Doc. 104-1 at 8, 35–36). Beyond that,

however, Sandberg never explicitly addressed how he ruled out the other possibilities.[3] In fact, Sandberg stated just the opposite: that he did not even test the alternate causes because he "didn't need to . . . because . . . in [his] mind it's clear that the battery in [Plaintiff's] pocket was shorted out by his keys, . . . and that's what happened." (*Id.* at 9).

Given that Sandberg's Report and deposition fail to explain the basis of Sandberg's causation conclusion, this Court is left only with the parties' arguments to determine the conclusion's reliability. The crux of Defendant's argument is that because the incident battery is missing, Sandberg never physically examined it and therefore he cannot opine that the thermal runaway was caused by an external short circuit, as opposed to some other cause. (Doc. 104 at 8). Plaintiff responds by listing out the evidence that Sandberg *did* have available to him. (Doc. 113 at 3). Plaintiff then asserts that, based on this evidence, Sandberg was able to rule out the other causes. (*Id.* at 4–5 ("[Sandberg] found no evidence to render an alternative cause more likely than less likely.")).

"An expert opinion requires some explanation as to how the expert came to his conclusion and what methodologies or evidence substantiate that conclusion." *Riegel v. Medtronic, Inc.*, 451 F.3d 104, 127 (2d Cir. 2006). Here, Plaintiff asserts that Sandberg was able to rule out battery damage and overcharging based on interviews with Plaintiff, his examination of the charger, and his review of Lindsay Niziolek's deposition. (Doc. 113 at 4–5). Plaintiff fails, however, to cite to any portion of the record that supports this

---

[3] One potential cause of thermal runaway—existing damage to the battery—seems to have been particularly overlooked by Sandberg. While Sandberg acknowledged that "when the [battery] wrapper becomes damaged, it's a whole lot easier for the connection to be made between the positive cap and the negative can," he subsequently stated, "I don't know" when he was asked whether the battery in Plaintiff's pocket was damaged prior to the incident. (Doc. 104-1 at 6). Sandberg also appears to have disregarded how Plaintiff used the battery prior to the incident—information that would have likely been useful in determining whether the battery had preexisting damage. (*Id.* at 3).

Plaintiff asserts that Sandberg relied on his interviews with Plaintiff, examination of the charger, and a review of Lindsay Niziolek's deposition to exclude battery damage as a cause. Defendant, however, notes that Sandberg denied having interviewed Plaintiff altogether. (Doc. 124 at 4 n.2). Further, this Court finds no explanation—from Sandberg or Plaintiff—of how Sandberg's examination of the charger indicated to Sandberg that the battery was undamaged. Finally, the Niziolek deposition excerpts provided to this Court (Doc. 104-1 at 64 & Doc. 113-7 at 2) show no discussion of battery damage.

assertion[4]—that is, that shows Sandberg actually *did* rule out battery damage and overcharging based on this specific evidence. And even if it were true, this Court would still be without an understanding of *how* Sandberg used the evidence to exclude the alternate causes. In other words, Plaintiff—and Sandberg, in his Report and deposition testimony—has not shown what aspects of Sandberg's interview with Plaintiff, his examination of the charger, and Niziolek's deposition allowed Sandberg to rule out battery damage and overcharging. Instead, all Plaintiff offers are conclusory assertions that Sandberg looked at certain evidence and ruled out certain causes. On this alone, the Court cannot find that Sandberg's opinion—here, excluding battery damage and overcharging as causes—is sufficiently reliable under *Daubert* because the Court has no insight into Sandberg's methodology. *See Daubert*, 509 U.S. at 595 ("The focus [of a Rule 702 inquiry] must be solely on principles and methodology, not on the conclusions they generate.").

Similar issues arise with the other potential causes. Plaintiff states that Sandberg's "extensive review of the literature" allowed him to rule out a manufacturing defect. (Doc. 113 at 5). Then Plaintiff states that the conditions of the battery's environment at the time of the explosion—the batteries being "loose" in Plaintiff's pocket on a cool November evening—allowed Sandberg to rule out overheating as a cause. (*Id.*). Again, what is missing is Sandberg's underlying methodology and reasoning. It is one thing to state that Sandberg reviewed literature and ruled out manufacturing defects; it is entirely different to explain—or, perhaps even better, to cite to a place where Sandberg himself explains—what specific literature was reviewed, what the literature revealed about batteries and manufacture defects, and why that allowed Sandberg to rule out a manufacturing defect as a potential cause. Because the principles and methodology of Sandberg's exclusions of alternate causes have not been shown, this Court cannot find those exclusions to be reliable.

---

[4] Plaintiff cites only to an unrevealing exchange between counsel and Sandberg during Sandberg's deposition. (Doc. 113 at 5). Plaintiff's counsel went through each of the alternate causes and asked Sandberg whether he had seen any evidence that led him to believe that the alternate cause was "more likely than less likely" to have caused the explosion. (Doc. 113-10 at 8–9). To each alternate cause, Sandberg responded that he had not and provided no further explanation. (*Id.*).

All told, this Court finds that—to the extent Sandberg concludes that an external short circuit was the probable or definite cause of the explosion—Sandberg's conclusion is not sufficiently reliable. Sandberg did not meaningfully explain the reasoning and methodology underlying the conclusion in his Report or at his deposition. While Plaintiff argues that Sandberg complied with NFPA 921, Plaintiff did not point to any place in the record that proves such compliance. And although Plaintiff argues that Sandberg was able to exclude other potential causes based on the evidence available to him, Plaintiff did not point to any place in the record where Sandberg actually did so, nor did Plaintiff meaningfully explain the methodology of such exclusions. As a result, the only support for Sandberg's causation conclusion is his demonstration which showed, at best, that an external short circuit was possible. Without any showing that the other potential causes were considered and reliably ruled out, however, this demonstration does not prove that an external short circuit was the probable cause, let alone the definite cause. This Court holds that Sandberg's causation conclusion—that an external short circuit was the probable cause of the explosion—is excluded under FRE 702 and the *Daubert* standard.

**B. Sandberg's Design Defect Opinion**

Sandberg concludes that LG 18650 H2 lithium-ion batteries are defective in design. (Doc. 104-2 at 3–5). According to Sandberg, the batteries are "intrinsically hazardous unless managed with adequate mechanical and electrical design and implementation." (*Id.* at 3). Sandberg concludes that the unprotected nature of the battery's terminals created a risk that the battery could short circuit if a metal object, such as a set of keys, bridged the tabs of the battery. (*Id.* at 3–5). Sandberg suggests three alternative designs that would have been safer: removable insulating brackets, a silicon jacket, or a seal with a warning. (*Id.* at 5). Sandberg states that all three of these designs would have protected the battery's terminals and prevented them from contacting the keys in Plaintiff's pocket and short circuiting the battery. (*Id.*).

Defendant argues that Sandberg's design defect opinion is unreliable because it is based entirely on the assumption that the explosion in this case was caused by an external

short circuit. (Doc. 104 at 7). This Court agrees. As discussed above, Sandberg failed to show that an external short circuit was the probable cause of the explosion. While he demonstrated that his causation theory was possible, he did not reliably exclude any of the other potential causes. Critically, some of the other potential causes—*e.g.*, battery damage, overcharging, manufacturing defect, and overheating—may have nothing to do with the unprotected nature of the terminals. If Sandberg has not reliably shown that the explosion was caused by an external short circuit that resulted from the unprotected terminals contacting the metal keys, then he cannot reliably testify that the batteries were defectively designed solely because the terminals were unprotected. *See Kumho Tire Co.*, 526 U.S. at 153–54 (upholding trial court's exclusion of expert's opinion that tire failed due to defect in part because expert had not reliably ruled out abuse as potential cause of tire's failure).

Even if Sandberg had shown that the explosion was probably caused by an external short circuit, his design defect opinion lacks sufficient facts and data and is not clearly the result of a reliable methodology. In supporting his conclusion that the 18650 battery is defectively designed Sandberg first establishes that the battery is "intrinsically hazardous." (Doc. 104-2 at 3). He does this by referencing a 2010 NASA presentation, the United Nations standard for shipping requirements, a Google search for 18650 battery fires that returned "400,000 hits," and a 2017 FEMA report. (*Id.* at 3–5). The NASA presentation purports to show that safety considerations related to 18650 batteries "were prominent" as early as 2010 and that it was "widely known" that they had the ability to self-destruct and produce external damage. (*Id.*). The UN shipping requirements apparently "show the critical nature of the protection of [battery] cells in transit." (*Id.* at 5, 7). The Google search and the 2017 FEMA report apparently show that, by the time Plaintiff purchased the batteries in October 2015, there had been many reports of e-cigarette battery explosions. (Docs. 104-2 at 5, 8 & 113-10 at 5). After establishing the danger of the 18650 battery, Sandberg makes the assertion that the battery is defectively designed because there were feasible alternative designs that would have prevented the accident. (Doc. 104-2 at 5).

The problem with Sandberg's design defect opinion is that "there is simply too great

an analytical gap between the data and the opinion proffered." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). Sandberg presented data indicating that 18650 batteries pose certain dangers. (Doc. 104-2 at 3–8). Sandberg then presented three alternative designs that would have covered the otherwise unprotected terminals. (*Id.* at 5). He suggests that, because the alternative designs were not adopted, the 18650 batteries are defectively designed. (*Id.*). Sandberg never meaningfully explains how the dangers to which he alludes relate to his conclusion that the battery was defectively designed. Merely showing that the batteries are a dangerous product does not automatically imply that they are defectively designed. Moreover, the Report's cited sources do not clearly indicate that the dangers posed by the batteries relate to the unprotected terminals. For example, the UN shipping requirements may show that the batteries are dangerous, but not necessarily because their terminals are unprotected. Similarly, a Google search for "lithium ion battery 18650 fire" that returns 400,000 hits only proves that the batteries may have been involved in a number of fire-related incidents; it does nothing to prove that such incidents were directly the result of unprotected terminals. The 2017 FEMA report lists over 100 "E-cigarette fires and explosion incidents" in the years leading up to Plaintiff's October 2015 battery purchase. The FEMA report does not, however, specify the causes of the incidents nor does it tie the incidents specifically to the unprotected terminals.

Plaintiff argues that Sandberg reliably supported his conclusion by conducting an "extensive cost/benefit analysis." (Doc. 113 at 9). This analysis consisted of Sandberg testifying that there were three alternative designs, that all were technologically and economically feasible in 2015, that all would have prevented this accident, and that the costs of an accident outweigh any benefits of the design utilized. (*Id.*). While Sandberg gave such testimony, he failed to support any of these assertions or explain his methodology in reaching them. Sandberg does not appear to have tested or researched his alternative designs. He did not compare their efficacy to other designs already on the market, such as the free silicon cases that many consumers are given upon purchasing a battery. (Doc. 104-1 at 42–43). Sandberg does not point to any studies or reports that

support his conclusion that the batteries are defectively designed. Sandberg fails to even prove that his alternative designs would have prevented Plaintiff's injuries, in part because he fails to prove that the explosion here was indeed a result of the unprotected terminals. And when asked to explain why he concluded that the costs of an accident outweighed the benefits of the current design, he did not respond with a systematic balancing of costs and benefits. Instead, he merely stated "[b]ecause the downside of the thing when it fails is significant personal injury." (Doc. 113-10 at 7).

These are just some of the ways in which Sandberg could have provided insight into the basis and methodology of his design defect opinion. Instead, Sandberg concludes that the battery is defectively designed merely because the battery is dangerous and because he has three alternative designs which he asserts would have prevented Plaintiff's injury. Sandberg's design defect opinion—that the battery was defectively designed—is excluded as unreliable under FRE 702 and the *Daubert* standard.

**C. Sandberg's Warnings Opinion**

The record indicates that on the date Plaintiff allegedly purchased the batteries, October 28, 2015, no warning was present on Plaintiff's receipt. (Doc. 104-2 at 12). By December 2, 2015, the date of Plaintiff's next purchase, Defendant had changed the receipt to include the following warning:

> Battery Warning – Store and transport your e-cigarette batteries in non-conductive cases such as the cases we give away for free. Do not store any Li-ion LiMN or any e-cigarette batteries in your pockets, purses, backpacks, or luggage without a proper undamaged case. Do not disassemble or tamper with batteries in any way. Discontinue using if there is damage to the battery, casing, or surrounding wrap, including but not limited to bulges, rips, tears and scarring. Misuse of the described batteries outside of safe handling guidelines may result in fire or explosion causing personal harm or property damage. Use at your own risk.

(*Id.* at 14). On December 11, 2015, Defendant put a safety card in the store next to where customers check out. (*Id.* at 2). Plaintiff made at least 13 more purchases from Defendant—each time receiving a receipt containing the warning—between December 2015 and

November 18, 2016, the date of the incident. (*Id.* at 18–43).

Sandberg's Report concludes that the warnings provided by Defendant "were inadequate." (*Id.* at 2). The Report purports to show that the batteries posed a known threat prior to Plaintiff's purchase and states that Defendant's "lack of warnings do not comport with the warnings a prudent manufacturer would provide, given the known danger." (*Id.* at 5). Defendant argues that this opinion should be excluded because Sandberg is not qualified to offer warnings opinions and because Sandberg did not employ any reliable methodology in reaching his conclusion.

Even assuming Sandberg is qualified to offer expert opinion on warnings, this Court cannot find Sandberg's warnings defect opinion to be reliable because it is unclear what methodology Sandberg employed in reaching his conclusion. In *Triant v. American Medical Systems, Inc.*—a case to which Plaintiff cites—a doctor sought to testify that the warnings associated with certain medical devices were adequate. *Triant v. Am. Med. Sys., Inc.*, No. CV-12-00450-PHX-DGC, 2020 WL 4049844, at *5 (D. Ariz. July 20, 2020). The Court excluded the opinion, in part, because the doctor

> does not address the content of the [warnings] or the risks they address, and he does not explain why he thinks the [warnings] provide adequate warnings of relevant risks. Nor does he say anything about the kinds of warnings expected by physicians or the standards he applied in concluding that the warnings in this case were adequate.

*Id.* Here, Sandberg similarly failed to address the specific content of the warnings and explain *why* the warnings were, in this case, inadequate. During his deposition, Sandberg was asked at least two times to explain what he meant when he concluded the warnings were inadequate. The first time, Sandberg responded, "Well, if they had been adequate . . . [Plaintiff] wouldn't have put [the battery] in his pocket when it had a possibility of shorting out." (Doc. 104-1 at 16). The second time, Sandberg stated that Defendant's addition of warnings after Plaintiff's October 2015 battery purchase was Defendant "essentially admitt[ing] . . . that the warnings weren't adequate." (*Id.* at 18). Neither of these explanations address what specific aspects of the warnings were deficient. Instead,

Sandberg seems to suggest that they were inadequate only because Plaintiff was injured and because Defendant decided to amend its warnings after Plaintiff's October 2015 purchase.

Moreover, Sandberg does not point to examples of what would have constituted adequate warnings, nor does he show any data, studies, or standards that he relied on in making his conclusion. As Defendant argues, Sandberg does not point to any research or testing on the efficacy of battery warnings. (Doc. 104 at 14). While it is true, as Plaintiff points out, that Defendant fails to cite to authority requiring such research or testing, (Doc. 113 at 12), it is abundantly clear that the *Daubert* standard requires something more than the mere "ipse dixit of the expert." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). "The trial court's gatekeeping function requires more than simply taking the expert's word for it." *Daubert v. Merrell Dow Pharm., Inc.*, 43 F.3d 1311, 1319 (9th Cir. 1995). "Something doesn't become scientific knowledge just because it's uttered by a scientist; nor can an expert's self-serving assertion that his conclusions were derived by the scientific method be deemed conclusive." *Henricksen v. ConocoPhillips Co.*, 605 F.Supp.2d 1142, 1154 (E.D. Wash. 2009). "[T]he expert's bald assertion of validity is not enough. Rather, the party presenting the expert must show that the expert's findings are based on sound science, and this will require some objective, independent validation of the expert's methodology." *Daubert*, 43 F.3d at 1316.

Here, the best Sandberg does to support his warnings defect opinion is show that the batteries were a known danger prior to Plaintiff's October 2015 purchase. For example, Sandberg cites to a 2010 NASA presentation which shows that "safety considerations were prominent at that time" and that it was "widely known" that 18650 battery cells had the ability to "self-destruct and produce external damage." (Doc. 104-2 at 3–5). Sandberg also refers to a 2017 FEMA report which showed an increase in the number of incidents involving vaping and battery issues. (Doc. 104-1 at 16–17). But merely showing that the batteries posed a danger, without more, speaks nothing to the adequacy of the warnings provided by Defendant. All told, Sandberg's warnings defect opinion lacks "sufficient facts

and data" to back it up and fails to show the methodology Sandberg used in reaching his conclusion. Instead, Sandberg seeks to opine that the warnings were inadequate without explaining why. This Court holds that Sandberg's conclusion—that the warnings were defective—is excluded because it is unreliable under FRE 702 and the *Daubert* standard.

### IV.  CONCLUSION

Therefore,

**IT IS ORDERED** that Defendant's Motion to Exclude (Doc. 104) is **granted** and Sandberg's opinions on causation, design defect, and warnings defect are excluded.

Dated this 19th day of October, 2021.

Honorable Steven P. Logan
United States District Judge